Bruce Evan **FOSTER**, Executor of the Estate of Niles Reid Foster, D.P.M., Appellant,

v.

Margarita B. **ZAVALA**, Appellee.

No. 11–05–00315–CV.

Court of Appeals of Texas, Eastland.

Dec. 21, 2006.

**108**

David A. Clark, Henry S. Platts Jr., Joseph M. Nixon, Beirne, Maynard & Parsons, L.L.P., Houston, for appellant.

Rick Dunbar, Jon Hanna, Law Office of Jon Hanna, Abilene, for appellee.

1. "Neuroma" refers to any type of tumor composed of nerve cells. Taber's Cyclopedic

Miles R. Nelson, Shafer, Davis, O'Leary & Stoker, Odessa, for Ector County Hospital District d/b/a Medical Center Hospital.

Scott M. Tidwell, Tidwell & Tidwell, L.L.P., Odessa, for Manaharial Parekh.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

This is an appeal from the trial court's denial of a motion to dismiss a medical malpractice claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2006). In the motion to dismiss, the executor for the estate of Dr. Niles Reid Foster, a podiatrist, requested that the health care liability claim against Dr. Foster be dismissed because Margarita B. Zavala's expert, Alan C. Leshnower, M.D., a cardiovascular surgeon, was not qualified to offer an expert opinion on the accepted standard of care for a podiatrist as required by TEX. CIV. PRAC. & REM.CODE ANN. § 74.402 (Vernon 2005). The trial court denied the motion, and the executor for Dr. Foster's estate filed this interlocutory appeal pursuant to TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon Supp.2006). We reverse and remand.

### Background Facts

Zavala went to see Dr. Foster because she was having problems with her feet. In December 2002, Dr. Foster performed surgery on Zavala's left foot to remove neuromas.[1] Because her foot did not heal, Zavala went to see Alan C. Leshnower, M.D., a cardiovascular surgeon, who observed that there was gangrene on the toes of her left foot. Dr. Leshnower determined that Za-

Medical Dictionary 1443 (19th ed. 2001).

vala had chronic vascular disease, diabetes, and inadequate blood flow to her feet. Dr. Leshnower performed vascular surgery, a femoral tibial bypass, on Zavala in February 2003. According to Dr. Leshnower, his surgery corrected Zavala's blood flow problem, but she then had four toes amputated by another doctor.

Prior to Zavala bringing this suit, Dr. Foster died. Zavala sued the executor of his estate alleging that Dr. Foster failed to properly diagnose her condition, failed to properly treat her condition, and performed unnecessary surgery in a negligent manner. Zavala further alleged that Dr. Foster's unnecessary and negligent surgeries caused irreparable harm to her foot. Zavala filed the report of her medical expert Dr. Leshnower as required by Section 74.351.

In his report, Dr. Leshnower set forth his reasons why Zavala's foot problems were the result of diminished blood flow, not the neuromas. According to Dr. Leshnower, Dr. Foster should have confirmed whether there was adequate blood flow to Zavala's foot by conducting non-invasive testing such as segmental artery studies. Dr. Leshnower stated that Zavala "had an improper workup by Dr. Foster and evaluation of her vascular status" and that the surgery on her foot was improper because "the last thing a diabetic patient with vascular disease needs is unnecessary surgical intervention." Dr. Leshnower concluded that, but for Dr. Foster's negligence in diagnosing and treating Zavala, Zavala's toe amputations and subsequent disability, pain, and impairment would have been avoided.

Appellant filed a motion to dismiss Zavala's suit, arguing that Dr. Leshnower's expert report failed to comply with the requirements of Sections 74.351 and 74.402 that Zavala's expert must practice health care in a field of practice that involves the same type of care and treatment as that delivered by Dr. Foster, a podiatrist. Appellant asserted that neither Dr. Leshnower's report nor his curriculum vitae demonstrated that Dr. Leshnower was qualified to opine on the standard of care for Dr. Foster.

### Standard of Review

A trial court's ruling on a motion to dismiss a health care liability claim is reviewed for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877–78 (Tex. 2001); *Kendrick v. Garcia,* 171 S.W.3d 698, 702–03 (Tex.App.-Eastland 2005, pet. den'd) (applying the abuse of discretion standard from *Palacios,* which dealt with a former health care liability statute, to the denial of a motion to dismiss under Section 74.351). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). In determining whether an expert report constitutes a good-faith attempt to comply with the statute, a trial court is limited to a review of the four corners of the report. *Palacios,* 46 S.W.3d at 878.

### Texas Medical Liability Act

In 2003, the Texas Legislature enacted the Texas Medical Liability Act making significant changes in the requirements for medical malpractice cases. *See* TEX. CIV. PRAC. & REM.CODE ANN. ch. 74 (Vernon 2005 & Supp.2006); *In re Huag,* 175 S.W.3d 449 (Tex.App.-Houston [1st Dist.] 2005, no pet.); *Group v. Vicento,* 164 S.W.3d 724, 727 (Tex.App.-Houston [14th Dist.] 2005, pet'n filed). The legislation enacting Chapter 74 listed a number of findings regarding the then current state of health care in Texas. Those findings included

determinations that the number of health care liability claims (frequency) had increased since 1995 inordinately, that the filing of legitimate health care liability claims in Texas was a contributing factor affecting medical professional liability rates, that the amounts being paid out by insurers in judgments and settlements (severity) had likewise increased inordinately in the same short period, that the situation had created a medical malpractice insurance crisis in Texas, and that the crisis had had a material adverse effect on the delivery of medical and health care in Texas.

Because of the conditions found by the legislature to have created the medical malpractice insurance crisis in Texas, the legislature stated that it was the purpose of Chapter 74 to improve and modify the system by which health care liability claims are determined in order to reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems; to decrease the cost of those claims and ensure that awards are rationally related to actual damages; and to do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis. TEX. CIV. PRAC. & REM.CODE ANN. § 74.001 historical note (Vernon 2005) [Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884–85].

Our review of the statutory provisions of Chapter 74 begins with the plain and common meaning of the words. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003). We must consider the statute as a whole, rather than analyze a provision in isolation. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex.2004);

*Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex.2001). Our primary objective is, of course, to determine and give effect to the legislature's intent. To achieve that objective, a court may consider the object sought to be attained, the circumstances under which the legislature enacted the statute, the legislative history, the common law or former statutory provisions including laws on the same or similar subjects, and the consequences of a particular construction. TEX. GOV'T CODE ANN. § 311.023(1), (3), (5) (Vernon 2005).

Section 74.351 provides the statutory requirements for expert reports in health care liability claims. Section 74.351(a) requires a plaintiff who files a "health care liability claim" to file an expert report within 120 days of filing its claim and serve the opposing parties with "one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." The date for serving the report may be extended by written agreement of the affected parties.[2] Section 74.351(a) also provides that each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the twenty-first day after the date it was served, otherwise all objections are waived.

An expert report is defined as:

[A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the

---

**2.** In this case, the parties entered into a Rule 11 agreement extending the 120–day dead- line. TEX.R. CIV. P. 11.

causal relationship between that failure and the injury, harm, or damages claimed.

Section 74.351(r)(6).

In a change from the predecessor statute, former TEX.REV.CIV. STAT. art. 4590i (1979), the legislature chose to separate the qualifications for experts testifying on the standards of care for physicians versus those for health care providers. *See* Sections 74.351(r)(5), 74.401, and 74.402. Section 74.351(r)(5) defines "expert" to mean:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402.

For expert testimony on the causal relationship between the failure to meet the standard of care and the injury claimed, Section 74.351(r)(5) contains separate definitions for "expert." Section 74.351(r)(5)(E) defines "expert" for the causal relationship in the case of a podiatrist:

(E) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

*See also* Section 74.403(c) (qualifications of an expert where the health claim is against a podiatrist).

Because podiatrists are "health care providers," Dr. Leshnower had to demonstrate in his report and curriculum vitae that he met the qualifications set forth in Section 74.402 in order to give an expert opinion on the standards of care for podiatrists.

### Qualifications of a Witness under Section 74.402

Section 74.402(b) lists three specific qualifications an expert witness must possess in order to provide opinion testimony on how a health care provider departed from accepted standards of health care:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

Section 74.402(b)(1) requires that the expert be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by [Dr. Foster]." The first question presented is whether Dr. Leshnower was "practicing

health care" as that phrase is used in Section 74.402.

Throughout Chapter 74, the legislature carefully distinguished between (i) a physician and a health care provider and (ii) medical care and health care.[3] "Health care" means any act or treatment performed or furnished or that should have been performed or furnished by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement. Section 74.001(a)(10). Health care is, thus, limited to those acts or treatments being performed or furnished by a health care provider. "Medical care" means any act defined as practicing medicine under TEX. OCC.CODE ANN. § 151.002 (Vernon Supp. 2006) performed or furnished, or that should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement. Section 74.001(a)(19).

Section 1.03(a)(3) of former Article 4590i limited the term "[h]ealth care provider" to only those licensed or chartered by the State of Texas "to provide health care as a registered nurse, hospital, dentist, podiatrist, pharmacist, or nursing home, or an officer, employee, or agent thereof acting in the course and scope of his employment." Section 74.001(a)(12)(A) of the newer Medical Liability Act broadened the definition of "health care provider":

> (12)(A) "Health care provider" means any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered,

or chartered by the State of Texas to provide health care, including:

> (i) a registered nurse;
> (ii) a dentist;
> (iii) a podiatrist;
> (iv) a pharmacist;
> (v) a chiropractor;
> (vi) an optometrist; or
> (vii) a health care institution.

While former Article 4590i, section 1.03(a)(3) specifically stated who was a "health care provider," the current legislative definitions of "health care" and "health care provider" involve circular reasoning. "Health care" is an act or treatment provided "by any health care provider," and a "health care provider" is any person who is licensed or chartered by the state to provide "health care." We are unable to tell from the definitions of "health care" and "health care provider" in Section 74.001 whether a physician "practices health care" for purposes of Section 74.402.

As in former Article 4590i, section 1.03(a)(3), Section 74.001 distinguishes a health care provider from a physician. A "[p]hysician" is an individual licensed to practice medicine in Texas or a professional association involving an individual physician or group of physicians. Section 74.001(a)(23).[4] Dr. Leshnower was a physician who practiced medicine under the statutory definition in Section 74.001(a)(23) and (19).

Despite the separate definitions for health care providers and physicians, there are other statutory provisions indicating that the legislature considered physicians

---

**3.** The same can be said of former Article 4590i.

**4.** Former Article 4590i, section 1.03 also defined "health care," "health care provider," "medical care," and "physician." The defini-

tions of these terms in Section 74.001 take on added significance in light of the new Sections 74.401 and 74.402. A podiatrist was considered a health care provider under former Article 4590i, section 1.03.

to be practicing health care. Section 74.001(a)(13) emphasizes the distinctions between health care providers and physicians and between health care and medical care but includes them in its definition of a health care liability claim:

> (13) "Health care liability claim" means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care.

Another section indicating that a physician is also a health care provider is Section 74.451(c) which refers to a violation of that section "by a health care provider other than a physician." Zavala relies on *Group*, 164 S.W.3d 724, for her argument that Dr. Leshnower was practicing health care.

In *Group*, the court found that an anesthesiologist was practicing health care in a field of practice that involved the same type of care as a chiropractor and, thus, was qualified to be an expert witness under Section 74.402. The chiropractor argued that the anesthesiologist was not "practicing health care" as defined by Section 74.402(a) because that section requires a qualified expert in a chiropractic malpractice case to either be a chiropractor, train chiropractors at an accredited educational institution, or serve as a consulting health care provider to chiropractors and to be licensed, certified, or registered as a chiropractor. *See* Section 74.402(a):

> (a) For purposes of this section, "practicing health care" *includes:*
>
> (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or
>
> (2) serving as a consulting health care provider and being licensed, cer-

tified, or registered in the same field as the defendant health care provider (emphasis added).

The court rejected the chiropractor's argument that "includes" restricts the practice of health care. The court held that the term "includes" is a term of enlargement and not of limitation. Although we agree that the term "includes" is a term of enlargement, the question remains whether a physician can be considered to be "practicing health care." The Houston court simply assumed that the anesthesiologist was "practicing health care" without stating the basis for its assumption.

■ We will assume, without deciding, that Dr. Leshnower was "practicing health care" as a cardiovascular surgeon. But he was required to be practicing that health care "in a field of practice that involves the same care or treatment" as a podiatrist. A "field" is an area or division of an activity or profession.[5] Under the common meaning, Dr. Foster practiced in the field of podiatry in the profession of health care and Dr. Leshnower practiced in the field of cardiovascular surgery in the profession of medical care. The common meaning of podiatry is the medical care and treatment of the human foot, whereas cardiovascular surgery relates to the heart and blood vessels.[6] Dr. Leshnower was not practicing in the same field—podiatry—as Dr. Foster. However, Section 74.402(b)(1) states that the expert be practicing health care "in a field of practice that involves the same type of care or treatment" as provided by the defendant health care provider.

The Texas House of Representatives' version of what became Section 74.402(b)(1) required the expert to be practicing health care "in the same field of practice" as the defendant health care pro-

5. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 465 (11th ed. 2004).

6. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 956 (11th ed. 2004).

vider. The senate's version required the expert to be practicing health care in "a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider." The senate's version became law. *Conference Comm. Report,* Tex. H.B. 4, 78th Leg., R.S.2003. It appears, therefore, that the legislature intended that an expert in another field be able to testify as to the standard of care for a health care provider only if that expert was practicing health care in a field of practice that "involve[d] the same type of care or treatment" as delivered by the defendant health care provider. However, there are indications in the legislative history that the senate version may have been adopted for reasons which would not preclude a holding that an expert on a podiatrist's standard of care be practicing in the same field. *See Hearings on Tex. H.B. 4 Before the Senate State Affairs Committee,* 78th Leg., R.S. 17–18 [Tape 4] (April 15, 2003) (testimony that a doctor should be judged by a doctor, but the term "in the same field" is unclear where a nursing home is concerned).

Zavala also relies on *Group* for her argument that Dr. Leshnower was practicing health care "in a field that involves the same type of care or treatment" as that delivered by Dr. Foster. The *Group* court held that Section 74.402 does not require that the expert be practicing in the same field as the defendant and that, because of his practice in pain management, an anesthesiologist was qualified to testify on the standard of care of a chiropractor. We agree with the *Group* court that the statute only requires that the expert be practicing "in a field," not necessarily the same field. This conclusion is supported by the legislative history that reflects that the phrase "in the same field" was rejected in favor of the senate version.

But we find that Dr. Leshnower's report and curriculum vitae do not demonstrate that his field "involved the same type of care or treatment" as that delivered by Dr. Foster. The report and curriculum vitae of the anesthesiologist in *Group* provided much more information on how the anesthesiologist considered himself to be practicing in a field that involved the same type of care or treatment as that delivered by the chiropractor. The expert report in *Group* contained five lengthy paragraphs describing in great detail how the fields of anesthesiology and chiropractic involved similar methods and treatments in pain management. The anesthesiologist also stated that he had supervised, been assisted by, and even taught chiropractors. Here, Dr. Leshnower simply stated that there was "significant overlap among the many subspecialties that treat diabetic patients" and then made the conclusory statement that the standard of care for a cardiovascular surgeon was the same as that for a podiatrist.

We find that Dr. Leshnower did not show that he was practicing health care in a field of practice that involved the same type of care or treatment as that delivered by Dr. Foster. A podiatrist and a cardiovascular surgeon approach the care and treatment of a patient from two different disciplines. This is a podiatry case. Zavala went to see Dr. Foster "because of problems with her feet"; she did not go to him for treatment for diabetes or vascular disease. Although Dr. Leshnower refers to Zavala in his report as a "known diabetic patient," the record does not contain evidence demonstrating that Dr. Foster was aware that she had diabetes or vascular disease. It is not surprising that an expert whose discipline involves the heart and blood vessels would evaluate a person's vascular health first.

■ Turning to the second requirement, Section 74.402(b)(2) required that Dr. Leshnower demonstrate that he "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." The diagnosis and treatment in this case involved the diagnosis and treatment of neuromas on Zavala's foot.

Zavala argues that the following portion of Dr. Leshnower's report demonstrates that he had the knowledge required by Section 74.402(b)(2):

> There is a significant overlap among the many subspecialties that treat diabetic patients in general and diabetic foot problems in particular. That is to say, the standard of care would be the same for me as a cardiovascular surgeon as it would for Dr. Foster, a podiatrist, as it applies to Mrs. Zavala. I would have been obligated to provide the same type of care or treatment, consistent with the standard of care, as would Dr. Foster. The standard of care for treating this patient requires that you must confirm the presence of adequate blood flow by non-invasive testing such as segmental artery studies.

Dr. Leshnower may be correct, but the report does not demonstrate how he had knowledge of the accepted standards of care for a podiatrist in treating Zavala's neuromas. It may be that another podiatrist who regularly was involved in the diagnosis, care, or treatment of foot neuromas would agree with Dr. Leshnower. However, we only have Dr. Leshnower's conclusory statement that the standard of care for a cardiovascular surgeon in this instance was the same as for a podiatrist.[7] *See Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Olveda v. Sepulveda,* 141 S.W.3d 679, 682–83 (Tex.App.-San Antonio 2004, pet. denied). The standard of care for Dr. Foster is what an ordinarily prudent podiatrist would have done under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880; *Hardy v. Marsh,* 170 S.W.3d 865, 869 (Tex.App.-Texarkana 2005, no pet.); *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). We find that the second requirement of Section 74.402(b)(2) was not met.

■ Finally, the third requirement in Section 74.402(b)(3) requires that Dr. Leshnower demonstrate that he was "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." In determining whether Dr. Leshnower was qualified on the basis of training or experience, the legislature mandated that we consider two factors. Section 74.402(c) provides as follows:

> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> > (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
> >
> > (2) is actively practicing health care in rendering health care services relevant to the claim.

Dr. Leshnower's curriculum vitae and report did not indicate that he was certified or had other substantial training or experience in the area of podiatry. Nor

---

7. Section 74.351(i) provides that a claimant may satisfy any requirement of Section 74.351 for serving an expert report by serving reports of separate experts.

did he demonstrate that he was actively practicing health care in rendering medical care and treatment of the human foot. Having considered the factors set forth in Section 74.402(c), we find that Dr. Leshnower did not demonstrate that he was qualified on the basis of training or experience as required by Section 74.402(b)(3).

Courts must demand strict compliance with the requirements of Section 74.402. From the legislative findings and statement of purpose, it is a reasonable inference that the legislature did not want a health care provider, such as a podiatrist, to be judged by the elevated standard of care for a specialist such as a cardiovascular surgeon.

■ An expert report by a person who is not qualified to testify under Section 74.402 regarding the standard of care does not represent an objective good faith effort to comply with the definition of an expert report in Section 74.351. *See In re Windisch,* 138 S.W.3d 507, 511 (Tex.App.-Amarillo 2004, orig. proceeding) (construing Article 4590i, section 13.01, the predecessor to Section 74.351). The report and accompanying curriculum vitae must demonstrate that the person is qualified to testify. *See Palacios,* 46 S.W.3d at 878; *In re Windisch,* 138 S.W.3d at 511. In assessing the adequacy of the report, the trial court must look only within the four corners of the report, and inferences are not permitted. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002); *Palacios,* 46 S.W.3d at 879. Because Dr. Leshnower's report and curriculum vitae do not demonstrate that he was qualified to testify as to the standard of care for Dr. Foster, a podiatrist, Zavala failed to serve an expert report as defined and required by Section 74.351. The trial court abused its discretion in refusing to dismiss Zavala's claim.

## May the Trial Court Consider Granting an Extension?

■ Zavala urges that we remand this case for the trial court to consider granting a Section 74.351(c) extension to cure the deficiency in her expert report rather than remand with an instruction to dismiss with prejudice. Failure to serve an adequate expert report mandates dismissal with prejudice. Section 74.351(b). However, if an expert report cannot be considered served because the report is found to be deficient, the trial court has discretion to grant one thirty-day extension to the claimant to cure the deficiency. Section 74.351(c); *Hardy,* 170 S.W.3d at 870–71.

In response to appellant's motion to dismiss, Zavala argued that Dr. Leshnower's report was adequate and filed a motion for sanctions against appellant for filing the motion to dismiss. The motion for sanctions was denied. Zavala did not request an extension in the event her report was found inadequate.

Zavala relies on *Longino v. Crosswhite,* 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.), as authority for this court to grant her request that the trial court be allowed to consider an extension. In *Longino,* the court held that the trial court erred in denying the doctor's challenge to the Crosswhites' expert report, remanded the case for further proceedings, and pointed out that the trial court could grant the Crosswhites an extension of time under Section 74.351(c). *Longino,* 183 S.W.3d at 918 n. 2. Relying on *Longino,* the court in *McKenna Mem'l Hosp., Inc. v. Quinney,* No. 03–06–00119–CV, 2006 WL 3246524 (Tex.App.-Austin November 10, 2006, no pet. h.) (mem. op.), after finding the report to be insufficient, also remanded for further proceedings and pointed out that the trial court had discretion to grant Quinney an extension of time to cure the deficiency. A third court in *Wells v. Ash-*

*more,* 202 S.W.3d 465 (Tex.App.-Amarillo 2006, no pet.), followed the same course.

Appellant argues that, in creating an interlocutory appeal, the legislature intended for the court of appeals to decide issues regarding the expert report with finality and that a remand under the circumstances of this case would conflict with the legislative purpose of Chapter 74 to reduce the frequency, severity, and cost of health care liability claims. We are not persuaded by this argument.

Chapter 74 shortened the time to file the requisite expert report after the filing of the malpractice claim to 120 days from 180 days under former Article 4590i, section 12.01; but the new statute also addressed the issue of defendants waiting to attack expert reports until it was too late for plaintiffs to timely file amended reports. Objections to the sufficiency of the report must be made no later than the twenty-first day after the date the report was served or all objections are waived. Section 74.351(a); George C. Hanks, Jr. and Rachel Polinger–Hyman, *Redefining the Battlefield,* 67 Tex. B.J. 936 (2004). Section 74.351(c) gives the trial court the discretion to grant a thirty-day extension to the claimant to remedy a deficient report. As part of the 2003 legislation creating Chapter 74, the legislature created an interlocutory appeal in TEX. CIV. PRAC. & REM.CODE. ANN. § 51.014(a)(9) and (10) (Vernon Supp.2006) from the denial or the grant of a motion to dismiss under Section 74.351. These are accelerated appeals with quicker deadlines and quicker dispositions by the appellate courts. TEX.R.APP. P. 28.1; 6 Roy W. McDonald & Elaine A. Grafton Carlson, TEXAS CIVIL PRACTICE § 1:17 (2d ed. 1998). By providing for interlocutory appeals, the legislature provided for a quick appellate review of the trial court's denial or grant of a defendant's motion to dismiss. Had the trial court reached the same decision we have concerning Dr. Leshnower's report and curriculum vitae, the trial court would have had the discretion to grant a thirty-day extension, and no appeal could have been taken from that order. Section 51.014(a)(9). The trial court still has that discretion.

*This Court's Ruling*

We reverse the trial court's order denying appellant's motion to dismiss and remand for further proceedings consistent with this opinion.