Reversed and Remanded and Memorandum Opinion filed September 30, 2008








Reversed
and Remanded and Memorandum Opinion filed September 30, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00263-CV

____________

 

MICHAEL J. REARDON, M.D., Appellant

 

V.

 

ROYCE NELSON, Appellee

 



 

On Appeal from the 334th
District Court

Harris County, Texas

Trial Court Cause No. 2006-58453

 



 

M E M O R A N D U M  O P I N I O N

Appellant Michael Reardon, M.D., files this interlocutory
appeal from the trial court=s denial of his motion to dismiss a
medical malpractice lawsuit brought by appellee Royce Nelson.  In four issues,
appellant contends that neither of appellee=s two expert
reports is sufficient to avoid mandatory dismissal under section 74.351 of the
Texas Civil Practice and Remedies Code.  We reverse.

 








On September 14, 2004, Royce Nelson, an 80-year-old
gentleman, sought treatment for chest pain and other symptoms of
coronary-artery blockage.  After performing a coronary angiography, Nelson=s doctor
recommended that he have coronary artery bypass surgery on his left anterior
descending (ALAD@) coronary artery and  his circumflex
artery.  Dr. Reardon, a cardiovascular surgeon, performed double coronary
artery bypass surgery on Nelson on or about September 16, 2004.  Nelson
continued to experience pain and shortness of breath after his discharge from
the double coronary bypass surgery, and was hospitalized at least once in late
September and again in October, 2004.  During a catheterization procedure in
October, the attending physician discovered bypass grafts to the LAD and ramus
arteries as well as a lesion and narrowing of the circumflex artery.  In order
to restore blood flow through the circumflex artery, the physician successfully
inserted a stent.

 Claiming that Dr. Reardon operated on the LAD and ramus
arteries rather than on the LAD and circumflex arteries, Nelson filed this
lawsuit.  Nelson seeks damages for physical pain and mental anguish, physical
impairment, and past and future medical expenses for treating the circumflex
artery that Dr. Reardon should originally have treated.  

Nelson=s claim is a Ahealth care
liability claim@ governed by Chapter 74 of the Texas Civil
Practice and Remedies Code.  See Tex. Civ. Prac. & Rem. Code '' 74.001B.507 (Vernon 2005
& Supp. 2007).  Under Chapter 74, within 120 days from filing suit, a
claimant is required to serve on each physician or health care provider at
least one expert report in support of the claim(s).  Id. ' 74.351(a).  If
the claimant timely serves the report, the physician or health care provider
may nonetheless challenge the report=s adequacy by
filing a motion to dismiss.  See id.  The trial court shall grant the motion
Aonly if it appears
to the court, after hearing, that the report does not represent an objective
good faith effort to comply with the definition of an expert report in
Subsection (r)(6).@  Id. ' 74.351(l).

Subsection (r)(6) defines an expert report as:








a written report by an expert that
provides a fair summary of the expert=s opinions ...
regarding applicable standards of care, the manner in which the care rendered
by the physician or health care provider failed to meet the standards, and the
causal relationship between that failure and the injury, harm, or damages
claimed.     

Id. ' 74.351(r)(6). 
Thus, the expert report must include the expert=s opinions on the
standard of care, breach, and causation.  See Am.  Transitional Care Ctrs. 
of Tex., Inc.  v. Palacios, 46 S.W.3d 873, 878B79 (Tex.  2001). 
In detailing these elements, if the report is to constitute a good faith
effort, the report must provide enough information to fulfill two purposes.  Gray
v. CHCA Bayshore L.P., 189 S.W.3d 855, 859 (Tex. App.CHouston [1st
Dist.] 2006, no pet.).  The report must both inform the defendant of the
specific conduct the claimant has called into question and provide a basis for
the trial court to conclude the claims have merit.  Id. (citing Palacios,
46 S.W.3d at 879).  In the report, the expert must state more than his
conclusions; the expert must explain the basis for his statements and link his
conclusions to the facts.  Id. (citing Bowie Mem=l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002)).  Finally, in assessing the report=s sufficiency, the
trial court must refrain from drawing inferences and must instead rely only on
the information contained within the report itself.  Id. (citing Palacios,
46 S.W.3d at 879).








Inherent in the definition of an expert report is the
requirement that its author actually be an expert.  See Clark v. HCA, Inc.,
210 S.W.3d 1, 6B7 (Tex. App.CEl Paso 2005, no
pet.) (citing several intermediate court opinions and noting that to comply
with statute, expert report must establish on its face that the purported
expert is qualified).  With respect to opinions regarding the standard of care
applicable to a physician and whether the physician breached such standard, a
person is an expert if his report and curriculum vitae demonstrate that (1) he
is a physician who (2) is practicing medicine at the time his testimony is
given or the claim arose; (3) has knowledge of accepted standards of medical
care for the diagnosis, care, or treatment of the illness, injury, or condition
involved in the claim; and (4) is qualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
medical care.  See Tex. Civ. Prac. & Rem. Code '' 74.351(r)(5)(A),
74.401(a).         To comply with these statutory requirements, Nelson was
required to serve on Dr. Reardon one or more reports, from qualified experts,
setting forth the applicable standard of care, the manner in which Dr. Reardon
failed to meet the standard of care, and the causal relationship between that
failure and Nelson=s claimed injury and damages.  See id.
' 74.351(a),
(r)(6).  Nelson served two reports on Dr. Reardon on January 11, 2007, one from
Dr. John Seaworth and the other from Dr. Ihsan Shanti. 

Dr. Reardon filed a motion to dismiss Nelson=s lawsuit,
contending that the expert reports, while timely, failed to satisfy the
statutory standards.  See id. ' 74.351(b), (c). 
Specifically, Dr. Reardon argued that each of Nelson=s purported
experts is not qualified to render an opinion on the standard of care for a
cardiovascular surgeon in the performance of a double cardiac bypass
operation.  He further alleged that neither expert sufficiently identified the
applicable standard of care and how Dr. Reardon allegedly breached such
standard.  The trial court denied Dr. Reardon=s motion to
dismiss, and Dr. Reardon now seeks interlocutory review of such denial under
Section 51.014(a)(9) of the Texas Civil Practice and Remedies Code.  See id.
' 51.014(a)(9)
(Vernon 2008).  

We review rulings on a section 74.351 motion to dismiss
under an abuse of discretion standard.  Gray, 189 S.W.3d at 858 (citing Palacios,
46 S.W.3d at 877); Estate of Regis ex rel. McWashington v. Harris County
Hosp. Dist., 208 S.W.3d 64, 67 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  A trial court abuses its discretion if it acts in an
arbitrary or unreasonable manner without reference to any guiding rules or
principles.  Garcia v. Martinez, 988 S.W.2d 219, 222 (Tex. 1999) (per
curiam).  When reviewing matters committed to the trial court=s discretion, a
court of appeals may not substitute its own judgment for that of the trial
court.  See Flores v. Fourth Ct. of Appeals, 777 S.W.2d 38, 41 (Tex.
1989).








Are
Nelson=s proffered
experts qualified to render opinions in this action?

In order to qualify as an expert in a particular case, a
physician need not be a practitioner in the same specialty as the defendant.  Broders
v. Heise, 924 S.W.2d 148, 153B54 (Tex. 1996); Blan
v. Ali, 7 S.W.3d 741, 745 (Tex. App.CHouston [14th
Dist.] 1999, no pet.).  The test is whether the served report and curriculum
vitae establish the witness=s knowledge, skill, experience, training,
or education regarding the specific issue before the court that would qualify
the expert to give an opinion on that particular subject.  Roberts v.
Williamson, 111 S.W.3d 113, 121 (Tex. 2003).  In assessing whether a witness
is qualified on the basis of training or experience to render expert opinions,
a trial court shall consider whether the proffered witness (1) is board
certified or has other substantial training or experience Ain an area of
medical practice relevant to the claim,@ and (2) is
actively practicing medicine Ain rendering medical care services
relevant to the claim.@  Tex. Civ. Prac. & Rem. Code ' 74.401(c). 

Dr. Reardon is a cardiac surgeon who performed double
cardiac bypass surgery on Nelson, but, in this lawsuit, Nelson does not
complain of Dr. Reardon=s surgical technique.  Indeed, in his
response to Dr. Reardon=s motion to dismiss in the trial court,
Nelson admitted, AThere was nothing wrong with the [bypass]
graft technique.@  Nelson=s complaint is
that Dr. Reardon performed the admittedly successful bypass on a healthy artery
rather than the artery needing the bypass.  It is in this context that we
address Dr. Reardon=s assertion that neither Dr. Shanti nor
Dr. Seaworth is qualified to render an expert report under Section 74.351.

Dr.
Shanti








Dr. Shanti is a board-certified anesthesiologist.  He is a
professor of anesthesiology at Baylor College of Medicine, and his curriculum
vitae indicates that he operates a pain-management clinic in Houston.  In his
report, Dr. Shanti claims to be qualified to render opinions on the standard of
care applicable to this case because he has assisted in Athe performing of
numerous cardiac bypass procedures through the providing of anesthesia to such
patients and the monitoring of such patients during the entire procedure.@  He further
states:

I am also qualified to review the medical records which have been
authored by Dr. Reardon, Dr. Guttin, Dr. Leachman and Dr. Robben, as well as
the records from Methodist Hospital, based on my training in medical school,
residency, internship and in my practice in providing anesthesia to surgical
patients, including cardiothoracic surgical patients.  I am qualified based on
my knowledge and training in basic anatomy, my residency in Anesthesiology and
my teaching at Baylor College of Medicine to be able to identify when a bypass
procedure, such as the one performed by Dr. Reardon, is performed on the wrong
artery.

Anesthesiologists are routinely involved in the planning of the cardiac
procedure conducted in preoperative care as well [as] caring for patients in
the post operative area in the cardiovascular intensive care unit.  I have also
assisted in numerous cases that are similar to Mr. Nelson in terms of the type
of procedure done with a coronary condition similar to this patient.

I am also qualified to address the immediate damages associated with
and resulting from such negligence.  As further described below, because Dr.
Reardon performed a bypass on the wrong artery, it was obviously necessary [to]
perform a second medical procedure in the form of a stint to the blocked artery
at issue which would not have been performed if Dr. Reardon had performed the
bypass to the correct artery as planned.

In addition anesthesiologists have
contributed prominently to the development of the safety of Cardiac Surgery,
including Coronary Bypass operations and open heart procedures.  The
development of narcotic anesthesia, a technique that permitted cardiac
operations even in those with poor myocardial function, as an example of the
role of Anesthesia care in the development of cardiac surgery; others also
include recent studies that defined the influences of anesthetic techniques or
underlying myocardial ischemic on the morbidity and mortality associated with
cardiac operations.  Anesthesiologist have continued to lead in the transfer of
technology into the operating room; a recent example is the intra operative use
of transesophageal echocardiography.








Neither the report nor Dr. Shanti=s curriculum vitae
contains information to support Dr. Shanti=s claim that his
education, experience, and training qualify him to render opinions as to the standard
of care and breach thereof in this case.  Dr. Shanti=s participation as
an anesthesiologist in Anumerous@ cardiac bypass
proceduresCwhether Anumerous@ means ten or a
hundredCdoes not
necessarily qualify him to render opinions in all health care liability claims
that may arise out of such procedures.  Cf. Broders, 924 S.W.2d at 152B54 (refusing to
hold that every medical doctor is qualified to testify on all medical
matters).  

In this case, Nelson claims that Dr. Reardon bypassed the
wrong artery.  Nelson=s claim thus requires explanation of the
standard of care related to a surgeon=s identification,
whether before or during surgery, or both, of the actual vessel needing the
bypass.  Nothing in Dr. Shanti=s report and curriculum vitae hints, much
less establishes, that he is actively practicing medicine in rendering medical
care services relevant to Nelson=s claim.[1] 
Dr. Shanti=s statement that A[a]nesthesiologists
are routinely involved in the planning of the cardiac procedure conducted in
preoperative care@ is too general and conclusory to support
a conclusion that Dr. Shanti is qualified to opine on the standard of care for
recognition and identification of vessels to be bypassed in surgery.  Equally
conclusory, and empty of informational support, is Dr. Shanti=s declaration, AI am qualified
based on my knowledge and training in basic anatomy, my residency in
Anesthesiology and my teaching at Baylor College of Medicine to be able to
identify when a bypass procedure, such as the one performed by Dr. Reardon, is
performed on the wrong artery.@ 








It is obvious from reading Dr. Shanti=s report that he
believes he is qualified to tender opinions on the standard of care applicable
to Dr. Reardon=s care of Nelson.  But, Dr. Shanti has not explained
how his stated experience (in providing anesthesia to bypass patients during
surgery and monitoring them after surgery; teaching anesthesiology and
practicing pain management) qualifies him to address the standard of care for a
cardiac surgeon (in identifying, before or during surgery,  coronary vessels
that had been clinically identified as needing bypass).  Without such an
explanation, there is no basis to support a conclusion that Dr. Shanti is
qualified to author a report that could satisfy Nelson=s obligation under
Section 74.351.  Thus, the trial court abused its discretion to the extent it
relied on Dr. Shanti=s report in denying Dr. Reardon=s motion to
dismiss.

Dr.
Seaworth

Dr. Seaworth is a cardiologist, but not a surgeon, and,
according to Dr. Reardon, is thus not qualified to opine on the standards of
care applicable to a cardiac surgeon. We recognize that Dr. Reardon has
surgical training and experience beyond that of Dr. Seaworth.  However, the
difference is not material if Dr. Seaworth is shown to have skill, experience,
training, or education regarding the specific issue before the court.  See,
e.g., Blan, 7 S.W.3d at 746 (stating determination of expert=s qualification
under Section 74.401(a) must focus Anot on the defendant
doctor=s area of
expertise, but on the condition involved in the claim@) (emphasis in
original).

Dr. Seaworth is board certified in both Internal Medicine
and Cardiology.  In his report, Dr. Seaworth makes the following statements: 

$                  
I have over 25
years experience caring for patients before and after coronary artery bypass
surgery.

$                  
I perform
cardiac interventions and evaluate patients for consideration of angioplasty or
coronary artery bypass surgery.

$                  
I have reviewed
thousands of coronary angiograms with surgeons before and after bypass surgery
to help determine which artery should be bypassed.

$                  
I have cared
for thousands of patients after bypass surgery who need further catheterization
and intervention for recurrent anginal symptoms after cardiac intervention or
bypass surgery.

$                  
My
current training, cardiology practice, and years of experience in dealing with
patients who have similar problems qualify me to have expert opinions and
judgements about the care of  Mr. Royce Nelson.








As noted above, Nelson claims that Dr. Reardon failed
actually to bypass the particular artery that had been clinically determined to
need the bypass.  Dr. Seaworth=s report sufficiently establishes, for
purposes of Section 74.351, his knowledge and experience regarding
identification of a surgical candidate=s arteries, by
treating patients before and after bypass surgery and reviewing coronary
angiograms with surgeons before bypass surgery.  In short, Dr. Seaworth=s report
demonstrates that he is board certified and has substantial other experience Ain an area of
medical practice relevant to the claim,@ and is actively
practicing medicine Ain rendering medical care services
relevant to the claim.@  See Tex. Civ. Prac. & Rem.
Code ' 74.401(c).  

The trial court did not abuse its discretion in impliedly
overruling Dr. Reardon=s objection to Dr. Seaworth=s qualification to
render expert opinions concerning Nelson=s claim.  We now
review Dr. Reardon=s assertion that even if Dr. Seaworth is
qualified, his report is deficient and fails to satisfy Nelson=s obligations
under Section 74.351.[2] 


Did
the trial court abuse its discretion by impliedly finding that Dr. Seaworth=s report
constitutes a good faith effort to comply with the statutory definition of an
expert report? 

Dr. Reardon claims that Dr. Seaworth=s opinions are
conclusory and not supported by sufficient information regarding what the
standard of care is for identification of coronary blood vessels that have been
diagnosed as needing bypass surgery.  Similarly, Dr. Reardon criticizes the
report for not specifying what Dr. Reardon should have done differently in
order to meet the standard of care. 

Dr. Seaworth=s report contains
the following statements concerning the standard of care applicable to Dr.
Reardon and Reardon=s alleged breach of that standard:








Prior to the bypass surgery, the cardiac catheterization worksheet of
September 15 identified and displays the presence of a ramus branch.  Prior to
and at the time of surgery it was the duty of Dr. Reardon, the surgeon, to
identify the anatomy and to assure that the correct vessels are bypassed.  The
surgical description dated September 16 does not show that any attempt to
identify the ramus branch and then locate the marginal branch was made.  This
failure to carefully identify the ramus branch, led to the error of sewing the
vein graft into the wrong vessel.

[The s]tandard of care requires that the correct coronary vessel be
bypassed at the time of coronary artery bypass surgery and that all possible
obstruction be bypassed.  Placement of a graft in the wrong vessel puts the
incorrectly bypassed vessel at risk of obstruction or closure and will require
further invasive procedures to open the vessel that was not bypassed.  These
additional procedures may include[:] cardiac catheterization, angioplasty with
stenting, or even a repeat bypass procedure with significant risks and costs. 
Mr. Nelson has already required further invasive procedures, and has a high
probability of requiring more in the future because of the error committed
during surgery.

In summary, [the] standard of care
at the time of the coronary artery bypass surgery was not met.  The wrong
coronary artery was bypassed and critical obstruction of coronary blood flow
was left untreated.  Restoration of blood flow to Mr. Royce Nelson=s heart will
require other procedures.  These procedures are potentially dangerous and
costly.  The patient may even need to have another open heart operation to
correct the error.








On its face, Dr. Seaworth=s report appears
to address Section 74.351's three required elements: standard of care, breach,
and causation.  But, A[w]hether a defendant breached the
standard of care due a patient cannot be determined without >specific
information about what the defendant should have done differently.=@ Gray, 189
S.W.3d at 859 (quoting Palacios, 46 S.W.3d at 880); see also CHCA
Mainland L.P. v. Burkhalter, 227 S.W.3d 221, 227 (Tex. App.CHouston [1st
Dist.] 2007, no pet.) (Aa >fair summary= is something less
than a full statement of the applicable standard of care and how it was
breached, [but] even a fair summary must set out what care was expected but not
given@).  And, as noted
above, such information must be contained within the four corners of the
report.  Palacios, 46 S.W.3d at 879.  We agree with Dr. Reardon that Dr.
Seaworth=s report provides
no specific factual information about what Reardon should have done differently
so as not to bypass the wrong blood vessel.[3]

When an expert=s report is
conclusory and fails to put the defendant or the trial court on notice of the
specific conduct complained of, the trial court has no discretion but to find
that the report does not represent a good faith effort to comply with Chapter
74 of the Texas Civil Practice and Remedies Code. Palacios, 46 S.W.3d at
880; see also Clark, 210 S.W.3d at 11.  We appreciate Nelson=s comment that A[t]his is an
obviously legitimate medical malpractice case,@ but we are
constrained to apply Chapter 74 to all cases that fall within the definition of
a Ahealth care
liability claim.@  And, while one purpose of Section 74.351=s expert-report
requirement is to allow the trial court to conclude that the claim has merit,
an equally important purpose is to inform the defendant of the specific conduct
called into question.  See Bowie, 79 S.W.3d at 53 (rejecting
intermediate court=s singular reliance on report=s satisfaction of
only one of the two purposes in determining that report met the good-faith
effort test).  Nelson has failed to do so here, and the trial court abused its
discretion in denying Dr. Reardon=s motion to
dismiss the claim.

Conclusion








In the trial court, in response to Dr. Reardon=s motion to
dismiss, Nelson argued that his expert reports satisfied the requirement of
Section 74.351, but also requested an extension of time in order to cure any
deficiency in the report(s).  We conclude that the trial court abused its
discretion to the extent it found that (1) Dr. Shanti=s report and
curriculum vitae establish his qualification to render opinions in this cause
and (2) Dr. Seaworth=s report represents a good-faith effort to
comply with the statute.  We therefore reverse the trial court=s denial of Dr.
Reardon=s motion to dismiss. 
We remand to the trial court for consideration of Nelson=s request for
extension of time, pursuant to Section 74.351(c),  to cure the deficiencies in
his expert-report submission.  See Murphy v. Mendoza, 234 S.W.3d 23, 30
(Tex. App.CEl Paso 2007, no pet.) (reversing denial of motion to
dismiss and remanding to allow trial court to consider request for extension to
cure timely but deficient report); Foster v. Zavala, 214 S.W.3d 106, 116B17 (Tex. App.CEastland 2006,
pet. denied) (same).

 

 

/s/      Jeff Brown

Justice

 

Judgment
Reversed and Remanded and Memorandum Opinion filed September 30, 2008

Panel
consists of Justices Yates, Anderson, and Brown.

 

 

 

 

 

 

 









[1]  Dr. Shanti=s
curriculum vitae reveals that he participated in a surgical internship for one
year, approximately a decade before Nelson=s
surgery.  There is no evidence that Dr. Shanti performed cardiac bypass surgery
during his internship.





[2]  Because we sustain Dr. Reardon=s claim that there is insufficient information to
establish Dr. Shanti=s qualification to render an expert opinion in this
case, we do not address Reardon=s alternate
claim that Dr. Shanti=s report also fails adequately to describe the
standard of care.





[3]  In his brief to this court, Nelson declares, ADr. Reardon needed to review the
pertinent medical tests which related to Mr. Nelson=s heart before surgery which
included the catheterization worksheet.  The statement in Dr. Seaworth=s report that Dr. Reardon=s operative report shows >no attempt to identify the ramus
branch and then the circumflex artery= is an obvious indication that Dr. Reardon simply did not
review the catheterization worksheet prior to surgery.@  While Nelson=s
briefing arguably clarifies the nature of his claim and the support Dr.
Seaworth=s report was intended to give it, we must restrict our
analysis to the report itself.  Palacios, 46 S.W.3d at 879; Gray,
189 S.W.3d at 859.  We cannot participate in Nelson=s counsel=s
infererence from Dr. Seaworth=s mention of
the catheterization worksheet that, according to Dr. Seaworth, Dr. Reardon had
a duty to review the worksheet.  The report itself is void of specific
information about what Dr. Reardon should have done differently, whether in
terms of pre-surgical determination of Nelson=s particular arterial anatomy or during surgery to identify the proper
subject of the bypass graft.