**Clyde Murff HARDY and Barbara J. Hardy, Appellants**

v.

**Denver C. MARSH, Jr., M.D., Appellee.**

No. 06–05–00056–CV.

Court of Appeals of Texas, Texarkana.

Submitted July 6, 2005.

Decided Aug. 17, 2005.

Larry L. Gollaher, Law Office of Larry
L. Gollaher, Dallas, for appellants.

Dana D. Banks, Smith, Rose, Finley, Harp & Price, San Angelo, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Clyde Murff Hardy and Barbara J. Hardy sued Denver C. Marsh, Jr., M.D., for medical malpractice. The trial court dismissed the suit because of an inadequate expert report filed pursuant to Section 74.351 of the Texas Civil Practice and Remedies Code,[1] and awarded Marsh his reasonable attorney's fees. The Hardys appeal, contending the report complied with the statute and further contending that, if the report was not in compliance, the trial court abused its discretion in failing to grant them a thirty-day extension in which to cure the defect. We affirm.

## Background

Clyde Hardy was a known diabetic. On August 5, 2002, he was admitted to Shannon West Texas Memorial Hospital in San Angelo, suffering from an acute myocardial infarction. Marsh, a cardiologist, was Clyde's attending physician. Marsh performed a catheterization and coronary angioplasty on Clyde. Following the surgery, Clyde initially appeared to be doing well, but eventually developed the onset of pain and weakening in his legs, particularly on the right side. Clyde thought he had a "blood clot," as he had suffered from them in the past. Marsh dismissed Clyde from the hospital August 9, 2002. The pain in Clyde's right leg persisted, and on August 12, 2002, he was readmitted to the hospital. A "right iliofemoral thromboembolectomy" was performed immediately, but three days later an above-the-knee amputation of Clyde's right leg became

necessary. The Hardys alleged in their lawsuit that Marsh's negligence in failing to properly investigate Clyde's complaint and in failing to consult a specialist proximately caused the loss of Clyde's leg and the other attendant injuries and resulting damages.

In compliance with TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), the Hardys filed an expert report prepared by Robert R. Cassella, M.D. Claiming the report did not comply with the Code requirements, Marsh moved to dismiss the lawsuit with prejudice. See TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l), (r)(6). The trial court agreed and dismissed the Hardys' case with prejudice. The trial court also denied the Hardys' motion for an extension of time in which to cure the expert report.

## The Report

The Hardys first contend the trial court abused its discretion when it determined Cassella's expert report did not constitute a good-faith effort to meet the statutory requirements of the Code. See TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l). Marsh alleges the report is deficient in its failure to adequately state the standard of care, a breach of that standard, and causation. Marsh also contends the report is conclusory and speculative.

The expert report states, in relevant part, as follows:

> This 77–year old [sic] gentleman presented to the emergency room with an acute myocardial infarction in progress, associated with severe bardycardia [sic] and hypotension. According to the records, his attending physician was a Dr. Denver C. Marsh, a cardiologist.

> Accordingly, the patient underwent angiography, which included left heart catherterization [sic], left ventricular an-

1. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351    (Vernon 2005).

giogram, supra-valvular aortogram, bilateral coronary angiogram, saphenous vein graft, left internal mammary artery graft and coronary angioplasty of the circumflex coronary artery.

Following his surgery, he initially appeared to be doing well, but he eventually developed the onset of pain and weakening in his legs, particularly on the right side. He made several complaints regarding this, both to Dr. Marsh and the attending staff. In one instance prior to release from the hospital, his right leg gave out. . . .

Approximately one week following his surgery, there was noted gross discoloration of his right lower extremity from the knee down. It was noted that, although he had a strong femoral pulse on the left, he had no femoral pulse on the right. Upon readmission to the hospital, impressions were as follows:

1. Thrombosis of the right limb of aorto-femoral bypass graft

2. Post cardiac catheterization with severe ischemia prolonged of the right lower extremity for four days

. . . .

On one of his recent post-operative visits to his physician Dr. Marsh, he relatedly [sic] stated that the pain in his right leg continued. There was a pulse in the right lower extremity with mottle and some coolness of the right leg below the level of the knee. He was seen by surgeon Dr. J. Michael Cornell regarding this, whose impression [was] that this patient had a superficial femoral artery occlusion and dysfunction of the right limb of the aortal femoral bypass. He suggested an emergency thromboembolectomy, a possible fem-fem bypass graft to salvage the right lower extremity. On 8–12–02, the patient underwent a right iliofemoral thromboembolectomy and a right four compartment fascioto-

my, under the direction of Dr. J. Michael Cornell. Dr. Cornell states that should he not show improvement the following day, that it was likely that he should be returned to the operating room for debridement or amputation as the findings of surgery would dictate.

. . . .

An important consideration which would help discern procedures to be followed would be a demonstration of an adequate run-off to the vessels supplying the legs. Judicious use of aortagrams [sic] and more distal arteriorgrams [sic] are considered important adjuncts in the precise and effective management of ischemic disease of the lower extremities.

It is my opinion that this patient should have had a consultation with a vascular surgeon in view of his complaints before his discharge on 8–9–02. I recognize fully the importance of his other medical problems. It is my opinion then that if this patient had had more immediate treatment that a salvage of his right leg would have been more probable. In my opinion, Dr. Marsh's failure to seek such a consultation and to use such diagnostic means was not in accordance with the applicable standard of care.

### A. Standard of Review

To constitute a good-faith effort to establish the causal relationship element under the Act, the expert report need not marshal all of the plaintiff's proof, or present evidence as if the plaintiff was actually litigating the merits. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52–53 (Tex. 2002); *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). No magic words such as "reasonable probability" are required for the report to comply with the Act. *Wright,* 79 S.W.3d at 53. The report, however, must provide enough information within the document both to

inform the defendant of the specific conduct at issue and to allow the trial court to conclude that the suit has merit. *Id.* at 52; *Palacios,* 46 S.W.3d at 879. A report merely stating the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Palacios,* 46 S.W.3d at 879. Finally, in assessing the adequacy of the report, the trial court must look only within the four corners of the report, and inferences are not permitted. *Wright,* 79 S.W.3d at 53; *Palacios,* 46 S.W.3d at 878. We review under an abuse of discretion standard a trial court's dismissal of a suit for failure to comply with the Code.[2] *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 877.

*B. The Report Failed To State an Applicable Standard of Care and its Breach*

■ The Hardys rely primarily on two sentences in Cassella's report as establishing the standard of care:

> An important consideration which would help discern procedures to be followed would be a demonstration of an adequate run-off to the vessels supplying the legs. Judicious use of aortagrams [sic] and more distal arteriorgrams [sic] are considered important adjuncts in the precise and effective management of ischemic disease of the lower extremities.

Thus, the Hardys argue that the failure to use such diagnostic procedures was not in accordance with the applicable standard of care.

■ The standard of care for a doctor is what a reasonable and prudent doctor would have done under the same or similar circumstances. *See Snow v. Bond,* 438 S.W.2d 549, 550–51 (Tex.1969). Identify-

ing the standard of care is critical because "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios,* 46 S.W.3d at 880.

The statements on which the Hardys rely are not statements of a standard of care. The first statement refers to "[a]n important consideration"—not a standard of care—"which would help discern procedures to be followed." The report then identifies that "important consideration" as "a demonstration of an adequate run-off to the vessels supplying the legs." And the second sentence refers to two tests presumably used in diagnosing or treating diseases of the lower extremities. The report does not state the procedures or treatments that should have been followed when Clyde complained of leg pain; instead, it merely states the general procedures and tests used to diagnose and treat "ischemic disease of the lower extremities."

Cassella's further statement—that Marsh's failure to seek consultation with a vascular surgeon and to use "such diagnostic means" was not in accordance with the applicable standard of care—does not put Marsh on notice of the specific conduct at issue. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *Palacios,* 46 S.W.3d at 880; *see Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.-El Paso 1995, writ denied). Nowhere does Cassella's report identify Clyde's specific symptoms requiring consultation with a vascular surgeon,

---

**2.** *Palacios* provides detailed analysis of why the standard of review is abuse of discretion, rather than de novo. 46 S.W.3d at 876–79. One of the reasons the *Palacios* court articulates is that the dismissal of the suit is a sanction, reviewed under an abuse of discre-

tion standard. When codifying the statute, the Legislature did not include the "sanction" language. The Legislature did, however, codify the same remedy—dismissal of the suit with prejudice—as had been provided in the statute.

when such consultation was required, or what treatment by such surgeon was required. Neither does the report specify what results the diagnostic tests would have been expected to reveal or what treatment would have been appropriate as a result of those tests.

When the conclusory statements in the expert report do not put a defendant on notice of the conduct complained of and allow the trial court to deduce that the suit has merit, Section 74.351(*l*) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as Section 74.351(r)(6) requires. Because the 120 days prescribed by Section 74.351(a) had passed when the trial court made that determination, Section 74.351(b) required the court to dismiss the Hardys' claims against Marsh with prejudice.

*C. The Expert Report Failed To Establish a Causal Relationship*

■ The Hardys rely mostly on one paragraph in the report to establish causation:

It is my opinion that this patient should have had a consultation with a vascular surgeon in view of his complaints before his discharge on 8–9–02. I recognize fully the importance of his other medical problems. It is my opinion then that if this patient had had more immediate treatment that a salvage of his right leg would have been more probable.

Nothing in this paragraph links Marsh's alleged inaction (immediate treatment as opposed to discharge) to Clyde's injury (the amputation). The report merely states that Clyde "should have had a consultation with a vascular surgeon." It does not state what additional procedures or treatment would have been provided by

the surgeon. Nor does it connect the consultation to avoidance of the amputation. Nowhere in the expert report does Cassella set forth factors or explain the medical basis for his opinion that "if this patient [Clyde] had had more immediate treatment that a salvage of his right leg would have been more probable."

While a "fair summary" is something less than all the evidence necessary to establish causation at trial, even a fair summary must contain sufficiently specific information to demonstrate causation beyond mere conjecture in order to meet the Code's requirements and satisfy the *Palacios* test. *See Wright,* 79 S.W.3d at 52. Cassella's report fails to provide sufficiently specific information to show more than speculation on the element of causation.

We conclude it was well within the trial court's discretion to find that the report did not meet the Code's requirement on the element of causation and to dismiss with prejudice the Hardys' claims against Marsh. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b), (*l*).

**Granting An Extension**

■ In the Hardys' second issue, they contend the trial court abused its discretion in denying their motion for a thirty-day extension because, in case of an inadequate expert report, "may" in Section 74.351(c) must be read as a "shall" or very close to a "shall." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

■ Section 74.351(c) provides:

If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency.

The use of the word "may" in a statute shows that the provision is discretionary and not mandatory. *Roberts v. Med. City*

*Dallas Hosp., Inc.,* 988 S.W.2d 398, 402 (Tex.App.-Texarkana 1999, pet. denied); *Weldon v. Weldon,* 968 S.W.2d 515, 518 (Tex.App.-Texarkana 1998, no pet.). When a trial court's function is discretionary and not mandatory, the reviewing court should give deference and wide latitude to the decision of the trial court. *Roberts,* 988 S.W.2d at 402. We should reverse only on a showing of a clear abuse of discretion. *Id.*

The Hardys argue that the Legislature has not provided any guidance as to what the word "may" means in this provision. Hence, in the absence of any guidance, "may" should be treated as "shall." We disagree. The word "may" creates discretionary authority. *See* TEX. GOV'T CODE ANN. § 311.016(1) (Vernon 2005). By using the word "may," Section 74.351(c) plainly vests the trial court with discretion to grant an extension. *See* TEX. GOV'T CODE ANN. § 312.002 (Vernon 2005) ("words shall be given their ordinary meaning"). The Hardys have not presented us with authority to hold otherwise.

We agree that a trial court should not arbitrarily or unreasonably withhold an extension. However, as pointed out to the trial court at the hearing on Marsh's motion to dismiss, the Hardys gave presuit notice of their claims almost a year before filing suit. The trial court could have reasonably believed the Hardys had already had sufficient time to obtain an adequate report. Under these circumstances, we cannot say the trial court abused its discretion in refusing to grant an extension.

## Conclusion

We affirm the trial court's judgment.