Opinion filed December 21, 2006

















 
 
  
 
 







 
 
  
 
 




Opinion filed December 21, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-05-00315-CV 

                                                     __________

 

                  BRUCE
EVAN FOSTER, EXECUTOR OF THE ESTATE 

                         OF NILES REID FOSTER, D.P.M., Appellant

 

                                                             V.

 

                                 MARGARITA
B. ZAVALA, Appellee

 



 

                                 On Appeal from the 161st District Court

 

                                                           Ector County, Texas

 

                                                Trial
Court Cause No. B-118,623

 



 

                                                                   O
P I N I O N

 








This is an appeal from the trial court=s denial of a motion to dismiss a
medical malpractice claim.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.351 (Vernon Supp. 2006).  In the motion to dismiss, the executor for
the estate of Dr. Niles Reid Foster, a podiatrist, requested that the health
care liability claim against Dr. Foster be dismissed because Margarita B.
Zavala=s expert,
Alan C. Leshnower, M.D., a cardiovascular surgeon, was not qualified to offer
an expert opinion on the accepted standard of care for a podiatrist as required
by Tex. Civ. Prac. & Rem. Code Ann. ' 74.402 (Vernon 2005).  The trial court denied the motion, and the
executor for Dr. Foster=s
estate filed this interlocutory appeal pursuant to Tex. Civ. Prac.
& Rem. Code Ann. '
51.014(a)(9) (Vernon
Supp. 2006).  We reverse and remand.

Background Facts

Zavala went to see Dr. Foster because she was
having problems with her feet.  In
December 2002, Dr. Foster performed surgery on Zavala=s
left foot to remove neuromas.[1]  Because her foot did not heal, Zavala went to
see Alan C. Leshnower, M.D., a cardiovascular surgeon, who observed that there
was gangrene on the toes of her left foot. 
Dr. Leshnower determined that Zavala had chronic vascular disease,
diabetes, and inadequate blood flow to her feet.  Dr. Leshnower performed vascular surgery, a
femoral tibial bypass, on Zavala in February 2003.  According to Dr.  Leshnower, his surgery corrected Zavala=s blood flow problem, but she then had
four toes amputated by another doctor.

Prior to Zavala bringing this suit, Dr. Foster
died.  Zavala sued the executor of his
estate alleging that Dr. Foster failed to properly diagnose her condition,
failed to properly treat her condition, and performed unnecessary surgery in a
negligent manner.  Zavala further alleged
that Dr. Foster=s
unnecessary and negligent surgeries caused irreparable harm to her foot.  Zavala filed the report of her medical expert
Dr. Leshnower as required by Section 74.351.

In his report, Dr. Leshnower set forth his reasons
why Zavala=s foot
problems were the result of diminished blood flow, not the neuromas.  According to Dr. Leshnower, Dr. Foster should
have confirmed whether there was adequate blood flow to Zavala=s foot by conducting non-invasive
testing such as segmental artery studies. 
Dr. Leshnower stated that Zavala Ahad
an improper workup by Dr. Foster and evaluation of her vascular status@ and that the surgery on her foot was
improper because Athe last
thing a diabetic patient with vascular disease needs is unnecessary surgical intervention.@ 
Dr. Leshnower concluded that, but for Dr. Foster=s
negligence in diagnosing and treating Zavala, Zavala=s
toe amputations and subsequent disability, pain, and impairment would have been
avoided.








Appellant filed a motion to dismiss Zavala=s suit, arguing that Dr. Leshnower=s expert report failed to comply with
the requirements of Sections 74.351 and 74.402 that Zavala=s expert must practice health care in a
field of practice that involves the same type of care and treatment as that
delivered by Dr. Foster, a podiatrist. 
Appellant asserted that neither Dr. Leshnower=s
report nor his curriculum vitae demonstrated that Dr. Leshnower was qualified
to opine on the standard of care for Dr. Foster.

Standard of Review

A trial court=s
ruling on a motion to dismiss a health care liability claim is reviewed for an
abuse of discretion.  Am. Transitional
Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877-78 (Tex. 2001); Kendrick
v. Garcia, 171 S.W.3d 698, 702-03 (Tex. App.CEastland
2005, pet. den=d)
(applying the abuse of discretion standard from Palacios, which dealt
with a former health care liability statute, to the denial of a motion to
dismiss under Section 74.351).  A trial
court abuses its discretion if it acts in an arbitrary or unreasonable manner
or without reference to any guiding rules or principles.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex.
1985).  In determining whether an expert
report constitutes a good-faith attempt to comply with the statute, a trial
court is limited to a review of the four corners of the report.  Palacios, 46 S.W.3d at 878.

Texas
Medical Liability Act

In 2003, the Texas Legislature enacted the Texas
Medical Liability Act making significant changes in the requirements for
medical malpractice cases.  See Tex. Civ. Prac. & Rem. Code Ann.
ch. 74 (Vernon 2005 & Supp. 2006);  In
re Huag, 175 S.W.3d 449 (Tex. App.CHouston
[1st Dist.] 2005, no pet.); Group v. Vicento, 164 S.W.3d 724, 727 (Tex.
App.CHouston
[14th Dist.] 2005, pet=n
filed).  The legislation enacting Chapter
74 listed a number of findings regarding the then current state of health care
in Texas.  Those findings included determinations that
the number of health care liability claims (frequency) had increased since 1995
inordinately, that the filing of legitimate health care liability claims in
Texas was a contributing factor affecting medical professional liability rates,
that the amounts being paid out by insurers in judgments and settlements
(severity) had likewise increased inordinately in the same short period, that
the situation had created a medical malpractice insurance crisis in Texas, and
that the crisis had had a material adverse effect on the delivery of medical
and health care in Texas.








Because of the conditions found by the legislature
to have created the medical malpractice insurance crisis in Texas, the
legislature stated that it was the purpose of Chapter 74 to improve and modify
the system by which health care liability claims are determined in order to
reduce excessive frequency and severity of health care liability claims through
reasonable improvements and modifications in the Texas insurance, tort, and
medical practice systems; to decrease the cost of those claims and ensure that
awards are rationally related to actual damages; and to do so in a manner that
will not unduly restrict a claimant=s
rights any more than necessary to deal with the crisis.  Tex.
Civ. Prac. & Rem. Code Ann. '
74.001 historical note (Vernon 2005) [Act of June 2, 2003, 78th Leg., R.S., ch.
204, ' 10.11,
2003 Tex.
Gen. Laws 847, 884-85].

Our review of the statutory provisions of Chapter
74 begins with the plain and common meaning of the words.  McIntyre v. Ramirez, 109 S.W.3d 741,
745 (Tex.
2003).  We must consider the statute as a
whole, rather than analyze a provision in isolation.  Tex.
Dep=t of
Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex.
2004); Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001).  Our primary objective is, of course, to
determine and give effect to the legislature=s
intent.  To achieve that objective, a
court may consider the object sought to be attained, the circumstances under
which the legislature enacted the statute, the legislative history, the common
law or former statutory provisions including laws on the same or similar
subjects, and the consequences of a particular construction.  Tex.
Gov=t Code Ann. '
311.023(1), (3), (5) (Vernon 2005).








Section 74.351 provides the statutory requirements
for expert reports in health care liability claims.  Section 74.351(a) requires a plaintiff who
files a Ahealth
care liability claim@
to file an expert report within 120 days of filing its claim and serve the
opposing parties with Aone
or more expert reports, with a curriculum vitae of each expert listed in the
report for each physician or health care provider against whom a liability
claim is asserted.@  The date for serving the report may be
extended by written agreement of the affected parties.[2]  Section 74.351(a) also provides that each
defendant physician or health care provider whose conduct is implicated in a
report must file and serve any objection to the sufficiency of the report not
later than the twenty-first day after the date it was served, otherwise all
objections are waived.  

An expert report is defined as:

[A]
written report by an expert that provides a fair summary of the expert=s opinions as of the date of the report
regarding applicable standards of care, the manner in which the care rendered
by the physician or health care provider failed to meet the standards, and the
causal relationship between that failure and the injury, harm, or damages
claimed.  

 

Section 74.351(r)(6).

In a change from the predecessor statute, former Tex. Rev. Civ. Stat. art. 4590i
(1979),  the legislature chose to
separate the qualifications for experts testifying on the standards of care for
physicians versus those for health care providers. See Sections 74.351(r)(5),
74.401, and 74.402.  Section 74.351(r)(5)
defines Aexpert@ to mean:

(A) with respect to a person giving opinion
testimony regarding whether a physician departed from accepted standards of
medical care, an expert qualified to testify under the requirements of Section
74.401;

 

(B) with respect to a person giving opinion
testimony regarding whether a health care provider departed from accepted
standards of health care, an expert qualified to testify under the requirements
of Section 74.402.

 

  For expert
testimony on the causal relationship between the failure to meet the standard
of care and the injury claimed, Section 74.351(r)(5) contains separate
definitions for Aexpert.@ 
Section 74.351(r)(5)(E) defines Aexpert@ for the causal relationship in the
case of a podiatrist:

(E) with respect to a person giving opinion
testimony about the causal relationship between the injury, harm, or damages
claimed and the alleged departure from the applicable standard of care for a
podiatrist, a podiatrist or physician who is otherwise qualified to render
opinions on such causal relationship under the Texas Rules of Evidence.

 

See also Section 74.403(c) (qualifications of an
expert where the health claim is against a podiatrist).

Because podiatrists are Ahealth
care providers,@ Dr.
Leshnower had to demonstrate in his report and curriculum vitae that he met the
qualifications set forth in Section 74.402 in order to give an expert opinion
on the standards of care for podiatrists.

 








Qualifications of a Witness under Section
74.402

Section 74.402(b) lists three specific
qualifications an expert witness must possess in order to provide opinion
testimony on how a health care provider departed from accepted standards of
health care:

(b) In a suit involving a health care liability
claim against a health care provider, a person may qualify as an expert witness
on the issue of whether the health care provider departed from accepted
standards of care only if the person:

 

(1) is practicing health care in a field of
practice that involves the same type of care or treatment as that delivered by
the defendant health care provider, if the defendant health care provider is an
individual, at the time the testimony is given or was practicing that type of
health care at the time the claim arose;

 

(2) has knowledge of accepted standards of care
for health care providers for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim; and 

 

(3) is qualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
health care.

 

Section 74.402(b)(1) requires that the expert be Apracticing health care in a field of
practice that involves the same type of care or treatment as that delivered by
[Dr. Foster].@  The first question presented is whether Dr.
Leshnower was Apracticing
health care@ as that
phrase is used in Section 74.402.








Throughout Chapter 74, the legislature carefully
distinguished between (i) a physician and a health care provider and (ii)
medical care and health care.[3]  AHealth
care@ means
any act or treatment performed or furnished or that should have been performed
or furnished by any health care provider for, to, or on behalf of a patient
during the patient=s medical
care, treatment, or confinement.  Section
74.001(a)(10).  Health care is, thus,
limited to those acts or treatments being performed or furnished by a health
care provider. AMedical
care@ means
any act defined as practicing medicine under Tex.
Occ. Code Ann. '
151.002 (Vernon Supp. 2006) performed or furnished, or that should have been
performed, by one licensed to practice medicine in this state for, to, or on
behalf of a patient during the patient=s
care, treatment, or confinement. Section 74.001(a)(19).

Section 1.03(a)(3) of former Article 4590i limited
the term A[h]ealth
care provider@ to only
those licensed or chartered by the State of Texas Ato
provide health care as a registered nurse, hospital, dentist, podiatrist,
pharmacist, or nursing home, or an officer, employee, or agent thereof acting
in the course and scope of his employment.@  Section 74.001(a)(12)(A) of the newer Medical
Liability Act broadened the definition of Ahealth
care provider@:             

(12)(A) AHealth
care provider@ means
any person, partnership, professional association, corporation, facility, or
institution duly licensed, certified, registered, or chartered by the State of
Texas to provide health care, including:

 

(i) a registered nurse;

(ii) a dentist;

(iii) a podiatrist;

(iv) a pharmacist;

(v) a chiropractor;

(vi) an optometrist; or

(vii) a health care institution.

 

While former Article 4590i, section 1.03(a)(3)
specifically stated who was a Ahealth
care provider,@ the
current legislative definitions of Ahealth
care@ and Ahealth care provider@ involve circular reasoning.  AHealth
care@ is an
act or treatment provided Aby
any health care provider,@
and a Ahealth
care provider@ is any
person who is licensed or chartered by the state to provide Ahealth care.@
We are unable to tell from the definitions of Ahealth
care@ and Ahealth care provider@ in Section 74.001 whether a physician Apractices health care@ for purposes of Section 74.402.

As in former Article 4590i, section 1.03(a)(3),
Section 74.001 distinguishes a health care provider from a physician. A A[p]hysician@
is an individual licensed to practice medicine in Texas or a professional association
involving an individual physician or group of physicians. Section
74.001(a)(23).[4]  Dr. Leshnower was a physician who practiced
medicine under the statutory definition in Section 74.001(a)(23) and (19).








Despite the separate definitions for health care
providers and physicians, there are other statutory provisions indicating that
the legislature considered physicians to be 
practicing health care.  Section
74.001(a)(13) emphasizes the distinctions between health care providers and
physicians and between health care and medical care but includes them in its
definition of a health care liability claim:

(13) AHealth
care liability claim@
means a cause of action against a health care provider or physician for
treatment, lack of treatment, or other claimed departure from accepted
standards of medical care, or health care.

 

Another section indicating that a physician is also a health care
provider is Section 74.451(c) which refers to a violation of that section Aby a health care provider other than a
physician.@  Zavala relies on Group, 164 S.W.3d
724, for her argument that Dr. Leshnower was practicing health care. 

In Group, the court found that an
anesthesiologist was practicing health care in a field of practice that
involved the same type of care as a chiropractor and, thus, was qualified to be
an expert witness under Section 74.402. 
The chiropractor argued that the anesthesiologist was not Apracticing health care@ as defined by Section 74.402(a)
because that section requires a qualified expert in a chiropractic malpractice
case to either be a chiropractor, train chiropractors at an accredited
educational institution, or serve as a consulting health care provider to
chiropractors and to be licensed, certified, or registered as a
chiropractor.  See Section
74.402(a):

(a) For purposes of this section, Apracticing health care@ includes:

 

(1) training health care providers in the same
field as the defendant health care provider at an accredited educational
institution; or 

 

(2) serving as a consulting health care provider
and being licensed, certified, or registered in the same field as the defendant
health care provider (emphasis added).

 

The court rejected the chiropractor=s
argument that Aincludes@ restricts the practice of health
care.  The court held that the term Aincludes@
is a term of enlargement and not of limitation. 
Although we agree that the term Aincludes@ is a term of enlargement, the question
remains whether a physician can be considered to be Apracticing
health care.@  The Houston
court simply assumed that the anesthesiologist was Apracticing
health care@ without
stating the basis for its assumption.  








We will assume, without deciding, that Dr.
Leshnower was Apracticing
health care@ as a
cardiovascular surgeon.  But he was
required to be practicing that health care Ain
a field of practice that involves the same care or treatment@ as a podiatrist. A Afield@
is an area or division of an activity or profession.[5]  Under the common meaning, Dr. Foster
practiced in the field of podiatry in the profession of health care and Dr.
Leshnower practiced in the field of cardiovascular surgery in the profession of
medical care.  The common meaning of
podiatry is the medical care and treatment of the human foot, whereas
cardiovascular surgery relates to the heart and blood vessels.[6]  Dr. Leshnower was not practicing in the same field
B podiatry B
as Dr. Foster.  However, Section
74.402(b)(1) states that the expert be practicing health care Ain a field of practice that involves
the same type of care or treatment@
as provided by the defendant health care provider.

The Texas House of Representatives= version of what became Section
74.402(b)(1) required the expert to be practicing health care Ain the same field of practice@ as the defendant health care
provider.  The senate=s version required the expert to be
practicing health care in Aa
field of practice that involves the same type of care or treatment as that
delivered by the defendant health care provider.@  The senate=s
version became law.  Conference Comm.
Report, Tex.
H.B. 4, 78th Leg., R.S. 2003.  It
appears, therefore, that the legislature intended that an expert in another
field be able to testify as to the standard of care for a health care provider
only if that expert was practicing health care in a field of practice that Ainvolve[d] the same type of care or
treatment@ as
delivered by the defendant health care provider.  However, there are indications in the
legislative history that the senate version may have been adopted for reasons
which would not preclude a holding that an expert on a podiatrist=s standard of care be practicing in the
same field.  See Hearings on Tex. H.B.
4 Before the Senate State Affairs Committee, 78th Leg., R.S. 17-18 [Tape 4]
(April 15, 2003) (testimony that a doctor should be judged by a doctor, but the
term Ain the
same field@ is
unclear where a nursing home is concerned).








Zavala also relies on Group for her
argument that Dr. Leshnower was practicing health care Ain
a field that involves the same type of care or treatment@
as that delivered by Dr. Foster.  The Group
court held that Section 74.402 does not require that the expert be practicing
in the same field as the defendant and that, because of his practice in pain
management, an anesthesiologist was qualified to testify on the standard of
care of a chiropractor.  We agree with
the Group court that the statute only requires that the expert be
practicing Ain a
field,@ not
necessarily the same field.  This
conclusion is supported by the legislative history that reflects that the
phrase Ain the
same field@ was
rejected in favor of the senate version.

But we find that Dr. Leshnower=s report and curriculum vitae do not
demonstrate that his field Ainvolved
the same type of care or treatment@
as that delivered by Dr. Foster.  The
report and curriculum vitae of the anesthesiologist in Group provided
much more information on how the anesthesiologist considered himself to be
practicing in a field that involved the same type of care or treatment as that
delivered by the chiropractor.  The
expert report in Group contained five lengthy paragraphs describing in
great detail how the fields of anesthesiology and chiropractic involved similar
methods and treatments in pain management. 
The anesthesiologist also stated that he had supervised, been assisted
by, and even taught chiropractors.  Here,
Dr. Leshnower simply stated that there was Asignificant
overlap among the many subspecialties that treat diabetic patients@ and then made the conclusory statement
that the standard of care for a cardiovascular surgeon was the same as that for
a podiatrist. 

We find that Dr. Leshnower did not show that he
was practicing health care in a field of practice that involved the same type
of care or treatment as that delivered by Dr. Foster.  A podiatrist and a cardiovascular surgeon
approach the care and treatment of a patient from two different
disciplines.  This is a podiatry
case.  Zavala went to see Dr. Foster Abecause of problems with her feet@; she did not go to him for treatment
for diabetes or vascular disease. 
Although Dr. Leshnower refers to Zavala in his report as a Aknown diabetic patient,@ the record does not contain evidence
demonstrating that Dr. Foster was aware that she had diabetes or vascular
disease.  It is not surprising that an
expert whose discipline involves the heart and blood vessels would evaluate a
person=s
vascular health first.   








Turning to the second requirement, Section
74.402(b)(2) required that Dr. Leshnower demonstrate that he Ahas knowledge of accepted standards of
care for health care providers for the diagnosis, care, or treatment of the illness,
injury, or condition involved in the claim.@  The diagnosis and treatment in this case
involved the diagnosis and treatment of neuromas on Zavala=s foot. 


Zavala argues that the following portion of Dr.
Leshnower=s report
demonstrates that he had the knowledge required by Section 74.402(b)(2):

There is a significant overlap among the many
subspecialties that treat diabetic patients in general and diabetic foot
problems in particular.  That is to say,
the standard of care would be the same for me as a cardiovascular surgeon as it
would for Dr. Foster, a podiatrist, as it applies to Mrs. Zavala.  I would have been obligated to provide the same
type of care or treatment, consistent with the standard of care, as would Dr.
Foster.  The standard of care for
treating this patient requires that you must confirm the presence of adequate
blood flow by non-invasive testing such as segmental artery studies.

 

Dr. Leshnower may be correct, but the report does not demonstrate
how he had knowledge of the accepted standards of care for a podiatrist in
treating Zavala=s
neuromas.  It may be that another
podiatrist who regularly was involved in the diagnosis, care, or treatment of
foot neuromas would agree with Dr. Leshnower. 
However, we only have Dr. Leshnower=s
conclusory statement that the standard of care for a cardiovascular surgeon in
this instance was the same as for a podiatrist.[7]  See Gray v. CHCA Bayshore L.P., 189
S.W.3d 855, 859 (Tex. App.CHouston
[1st Dist.] 2006, no pet.); Olveda v. Sepulveda, 141 S.W.3d 679,
682-83 (Tex.
App.CSan
Antonio 2004, pet. denied).  The standard
of care for Dr. Foster is what an ordinarily prudent podiatrist would have done
under the same or similar circumstances. 
See Palacios, 46 S.W.3d at 880; Hardy v. Marsh, 170 S.W.3d
865, 869 (Tex. App.CTexarkana
2005, no pet.); Strom v. Mem=l
Hermann Hosp. Sys., 110 S.W.3d 216, 222 (Tex. App.CHouston
[1st Dist.] 2003, pet. denied).  We find
that the second requirement of Section 74.402(b)(2) was not met.

Finally, the third requirement in Section
74.402(b)(3) requires that Dr. Leshnower demonstrate that he was Aqualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
health care.@  In determining whether Dr. Leshnower was
qualified on the basis of training or experience, the legislature mandated that
we consider two factors.  Section
74.402(c) provides as follows:

(c) In determining whether a witness is qualified
on the basis of training or experience, the court shall consider whether, at
the time the claim arose or at the time the testimony is given, the witness:








 

(1) is certified by a licensing agency of one or
more states of the United States or a national professional certifying agency,
or has other substantial training or experience, in the area of health care
relevant to the claim; and

 

(2) is actively practicing health care in
rendering health care services relevant to the claim.

 

Dr. Leshnower=s
curriculum vitae and report did not indicate that he was certified or had other
substantial training or experience in the area of podiatry.  Nor did he demonstrate that he was actively
practicing health care in rendering medical care and treatment of the human
foot.  Having considered the factors set
forth in Section 74.402(c), we find that Dr. Leshnower did not demonstrate that
he was qualified on the basis of training or experience as required by Section
74.402(b)(3).

Courts must demand strict compliance with the
requirements of Section 74.402.  From the
legislative findings and statement of purpose, it is a reasonable inference
that the legislature did not want a health care provider, such as a podiatrist,
to be judged by the elevated standard of care for a specialist such as a
cardiovascular surgeon.  

 An expert
report by a person who is not qualified to testify under Section 74.402
regarding the standard of care does not represent an objective good faith
effort to comply with the definition of an expert report in Section
74.351.  See In re Windisch, 138
S.W.3d 507, 511 (Tex. App.C
Amarillo 2004, orig. proceeding) (construing Article 4590i, section 13.01, the
predecessor to Section 74.351).  The
report and accompanying curriculum vitae must demonstrate that the person is
qualified to testify.  See Palacios,
46 S.W.3d at 878; In re Windisch, 138 S.W.3d at 511.  In assessing the adequacy of the report, the
trial court must look only within the four corners of the report, and
inferences are not permitted.  Bowie Mem=l
Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex.
2002); Palacios, 46 S.W.3d at 879. 
Because Dr. Leshnower=s
report and curriculum vitae do not demonstrate that he was qualified to testify
as to the standard of care for Dr. Foster, a podiatrist, Zavala failed to serve
an expert report as defined and required by Section 74.351.  The trial court abused its discretion in
refusing to dismiss Zavala=s
claim. 

May the Trial Court Consider Granting an
Extension?








Zavala urges that we remand this case for the
trial court to consider granting a Section 74.351(c) extension to cure the
deficiency in her expert report rather than remand with an instruction to
dismiss with prejudice.  Failure to serve
an adequate expert report mandates dismissal with prejudice.  Section 74.351(b).  However, if an expert report cannot be considered
served because the report is found to be deficient, the trial court has
discretion to grant one thirty-day extension to the claimant to cure the
deficiency.  Section 74.351(c); Hardy,
170 S.W.3d at 870-71.

In response to appellant=s
motion to dismiss, Zavala argued that Dr. Leshnower=s
report was adequate and filed a motion for sanctions against appellant for
filing the motion to dismiss.  The motion
for sanctions was denied.  Zavala did not
request an extension in the event her report was found inadequate.  

Zavala relies on Longino v. Crosswhite, 183
S.W.3d 913 (Tex. App.CTexarkana
2006, no pet.), as authority for this court to grant her request that the trial
court be allowed to consider an extension. 
In Longino, the court held that the trial court erred in denying
the doctor=s
challenge to the Crosswhites=
expert report, remanded the case for further proceedings, and pointed out that
the trial court could grant the Crosswhites an extension of time under Section
74.351(c).  Longino, 183 S.W.3d at
918 n.2.  Relying on Longino, the
court in McKenna Mem=l
Hosp., Inc. v. Quinney, No. 03-06-00119-CV, 2006 WL 3246524 (Tex. App.CAustin November 10, 2006, no pet. h.)
(mem. op.), after finding the report to be insufficient, also remanded for further
proceedings and pointed out that the trial court had discretion to grant
Quinney an extension of time to cure the deficiency.  A third court in Wells v. Ashmore, 202
S.W.3d 465 (Tex. App.CAmarillo
2006, no pet.), followed the same course.

Appellant argues that, in creating an
interlocutory appeal, the legislature intended for the court of appeals to
decide issues regarding the expert report with finality and that a remand under
the circumstances of this case would conflict with the legislative purpose of
Chapter 74 to reduce the frequency, severity, and cost of health care liability
claims.  We are not persuaded by this
argument. 








Chapter 74 shortened the time to file the
requisite expert report after the filing of the malpractice claim to 120 days
from 180 days under former Article 4590i, section 12.01; but the new statute
also addressed the issue of defendants waiting to attack expert reports until
it was too late for plaintiffs to timely file amended reports.  Objections to the sufficiency of the report
must be made no later than the twenty-first day after the date the report was
served or all objections are waived. 
Section 74.351(a); George C. Hanks, Jr. and Rachel Polinger-Hyman, Redefining
the Battlefield, 67 Tex.
B.J. 936 (2004).  Section 74.351(c) gives
the trial court the discretion to grant a thirty-day extension to the claimant
to remedy a deficient report.  As part of
the 2003 legislation creating Chapter 74, the legislature created an interlocutory
appeal in Tex. Civ. Prac. & Rem.
Code. Ann. '
51.014(a)(9) and (10) (Vernon Supp. 2006) from the denial or the grant of a
motion to dismiss under Section 74.351. 
These are accelerated appeals with quicker deadlines and quicker
dispositions by the appellate courts.  Tex. R. App. P. 28.1; 6 Roy W. McDonald
& Elaine A. Grafton Carlson, Texas Civil Practice '
1:17 (2d ed. 1998).   By providing for
interlocutory appeals, the legislature provided for a quick appellate review of
the trial court=s denial
or grant of a defendant=s
motion to dismiss.  Had the trial court
reached the same decision we have concerning Dr. Leshnower=s report and curriculum vitae, the
trial court would have had the discretion to grant a thirty-day extension, and
no appeal could have been taken from that order.  Section 51.014(a)(9).  The trial court still has that discretion.

This Court=s
Ruling

We reverse the trial court=s
order denying appellant=s
motion to dismiss and remand for further proceedings consistent with this
opinion.

 

TERRY McCALL

JUSTICE

 

December 21, 2006

Panel
consists of:  Wright, C.J., 

McCall,
J., and Strange, J.











[1]ANeuroma@ refers to any type of tumor composed of nerve cells.
Taber=s Cyclopedic Medical Dictionary 1443 (19th ed. 2001).  





[2]In this case, the parties entered into a Rule 11
agreement extending the 120-day deadline. 
Tex. R. Civ. P. 11.





[3]The same can be said of former Article 4590i.





[4]Former Article 4590i, section 1.03 also defined Ahealth care,@ Ahealth care provider,@ Amedical care,@ and Aphysician.@  The definitions of these terms in Section
74.001 take on added significance in light of the new Sections 74.401 and
74.402.  A podiatrist was considered a
health care provider under former Article 4590i, section 1.03.





[5]Merriam-Webster=s Collegiate Dictionary 465 (11th ed. 2004).





[6]Merriam-Webster=s Collegiate Dictionary 956 (11th ed. 2004).





[7]Section 74.351(i) provides that a claimant may satisfy
any requirement of  Section 74.351 for
serving an expert report by serving reports of separate experts.