# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-06-00785-CV

---

**John Klotz Stokes, M.D., Appellant**

**v.**

**David Delarosa, Appellee[1]**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-06-002153, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Dr. John Klotz Stokes appeals a district court order denying his motion to dismiss David Delarosa's health care liability claim against him for failure to file an expert report complying with chapter 74 of the civil practice and remedies code. We will affirm the district court's order.

## BACKGROUND

Delarosa was injured in a car accident on April 11, 2004. He was treated at Austin's Brackenridge Hospital, where he was initially diagnosed with a fracture of the cervical spine at the C5-6 level. Additional testing indicated that Delarosa's right vertebral artery was "occluded," i.e., obstructed or blocked. Because of these findings, Dr. Stokes, a neurosurgeon, was consulted. On April 12, 2004, Dr. Stokes performed a posterior cervical fusion on Delarosa, fusing

---

[1] This cause was reassigned to the present panel and judge on March 18, 2009.

the C5-6 vertebrae and inserting pins, screws, and a plate. No action was taken to address the occlusion in the right vertebral artery. According to Dr. Stokes in his briefing, the artery was not "manipulated" because it "was found to be completely occluded by bone fragment." Delarosa was discharged on April 14, 2004.

On April 17, 2004, Delarosa began complaining of difficulty walking. He was taken to another local hospital and eventually transferred to Brackenridge, where a cerebral anteriogram and CT of the head were performed. The tests showed that Delarosa had suffered one or more strokes. According to the tests, the strokes were in the cerebellar region of the brain.

On April 22, 2004, Delarosa was transferred to Healthsouth Rehabilitation Hospital because of problems with his gait and other complications resulting from his stroke. On May 5, 2004, he was discharged and treated as an outpatient.

On June 14, 2006, Delarosa filed a health care liability claim against Dr. Stokes and Brackenridge alleging negligence relating to the treatment he received immediately following the car accident. On October 11, 2006—the 119th day after he filed suit—Delarosa filed the expert report of Dr. John Sterling Meyer in an attempt to comply with section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2008). Contending that the Dr. Meyer's report failed to comply with section 74.351, Dr. Stokes filed a motion to dismiss. *See id.* § 74.351(b). The district court denied the motion. Stokes appealed. *See id.* § 51.014(a)(9) (West 2008).

2

## DISCUSSION

A trial court's decision to deny a motion to dismiss based on section 74.351 is reviewed for an abuse of discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

As noted, Delarosa's health care liability claim is governed by chapter 74 of the civil practice and remedies code, which requires that an adequate expert report be filed no later than the 120th day after the date the claim is filed. Section 74.351 provides, in relevant part:

> (a)    In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.
>
> . . .
>
> (r)(6)  "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (a), (r)(6) (West Supp. 2008). Interpreting the predecessor to section 74.351, the Texas Supreme Court explained:

> A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. In setting out the expert's opinions on each of those elements, the report must provide enough information to

3

fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.

*Palacios*, 46 S.W.3d at 875 (internal citations omitted); *see* Act of May 18, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(r)(5), 1995 Tex. Gen. Laws 985 (repealed 2003).

Dr. Stokes argues that Dr. Meyer's expert report fails to meet statutory requirements because it does not clearly state a single standard of care and because the opinions set out are "so vague and conclusory that they do not provide a 'fair summary' of the applicable standard of care." Specifically, Dr. Stokes urges that Dr. Meyer provides inconsistent descriptions of the standard of care. Dr. Stokes cites the following statements made by Dr. Meyer:

> Pursuant to the applicable standard of care, the occluded and now thrombosed right vertebral artery should have been treated immediately by thrombolytic agents injected into the vertebral artery during surgery with attempts to remove the thrombus by Dr. Stokes or consulting with an interventional radiologist for placing a catheter in the vertebral artery and removing the clot by suction or injection of tissue plasminogen activator (TPA) to lyse it.

Later in his report, Dr. Meyer writes:

> The Standard of Care requires that as soon as possible after the thrombosis of the vertebral artery was demonstrated that consultation be sought with a neurologist or neurosurgeon or interventional neuroradiologist to attempt to dissolve or remove the vertebral artery thrombosis. The standard of care also requires the physician to monitor the patient with anticoagulant or Heparin long-term and anti-platelet therapy using either Aspirin or Plavix.

4

Stokes argues that Dr. Meyer has presented two different standards of care and failed to explain why or when each applies. Reading the two statements together, however, does not present the conflict suggested by Dr. Stokes. In both instances, Dr. Meyer states that the applicable standard of care requires immediate treatment and removal of the artery thrombosis. In the second instance, Dr. Meyer adds that "the standard of care also requires" administration of certain medication after surgery, as well as continued monitoring. There is no apparent contradiction between the two statements.

Also, with respect to the standard of care set out by Dr. Meyer, Dr. Stokes argues that Dr. Meyer's opinions are "so vague and conclusory that they do not provide a 'fair summary' of the applicable standard of care." And, according to Dr. Stokes, Dr. Meyer only mentions a breach of the standard of care in an "even more vague and conclusory" manner, referring to the following:

> As noted above, Dr. Stokes' surgical treatment fell below the standard of care, so that the patient, as a result of his negligence in ignoring the vertebral artery clot, suffered thrombosis of one of the four main arteries supplying the brain, which caused permanent disability and inability to work or lead a normal life.

In support of his argument that Dr. Meyer's statements are too "vague and conclusory" to satisfy the requirements of section 74.351(r)(6), Dr. Stokes relies on *McKenna Memorial Hospital v. Quinney*, No. 03-06-00119-CV, 2006 Tex. App. LEXIS 9781 (Tex. App.—Austin Nov. 10, 2006, pet. denied) (mem. op.) and on *Hardy v. Marsh*, 170 S.W.3d 865 (Tex. App.—Texarkana 2005, no pet.). In *McKenna*, we compared the statements in the expert report at issue to those deemed conclusory by the supreme court in *Palacios*:

5

He states that on the intake form the triage nurse checked off as "N/A (not applicable)" three areas that "should have been at the top of the concern here," but he does not state what the triage nurse should have done differently in filling out the form. Dr. Lowry's report criticizes Dr. Butter for not conducting a "thorough enough history," for failing to perform a "thorough enough exam to even justify the 'radiculopathy' diagnoses," for not "delv[ing] into the possibility of an OB etiology," and for not taking any labs or x-rays. While in hindsight it may be possible to point out additional steps that could have been taken to diagnose Quinney's MRSA infection, Dr. Lowry's report does not explain what steps an ordinarily prudent physician would have been required to take. Dr. Lowry does reference other doctors in his report when he states that "most doctors I know would automatically be thinking a Gyn/Ob issue is possibly going on here and the 'hip' or low-back pain may be being caused by this." This comment falls short of invoking an appropriate standard of care, which inquires as to what an ordinarily prudent doctor would have done under the same or similar circumstances.

2006 Tex. App. LEXIS 9781, at *12-13. The distinguishing factor in *McKenna* is that, while the expert report provided additional steps that, "in hindsight," "could have been taken to diagnose" the infection, the report did not state what the medical providers should have done differently at the time of treatment. Here, in contrast, Dr. Meyer clearly states what should have been done differently: the artery thrombosis should have been immediately treated and removed, anti-platelet therapy should have been administered, and Delarosa should have both been monitored and instructed as to signs and symptoms of impending stroke. *McKenna*, therefore, offers little support for Dr. Stokes's contentions.

In *Hardy*, the expert statements at issue were the following:

An important consideration which would help discern procedures to be followed would be a demonstration of an adequate run-off to the vessels supplying the legs. Judicious use of aortagrams [sic] and more distal arteriorgrams [sic] are considered important adjuncts in the precise and effective management of ischemic disease of the lower extremities.

6

170 S.W.3d at 869. The court held that these statements did not describe a standard of care, but merely set out an "important consideration" and "d[id] not state the procedures or treatments that should have been followed when [the claimant] complained of leg pain." *Id.* Further, according to the *Hardy* court, nothing in the report was sufficient to put the doctor on notice of the specific conduct at issue: "'It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met.'" *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

Here, Dr. Meyer described the standard of care and what should have been done differently: the artery thrombosis should have been immediately treated and removed, anti-platelet therapy should have been administered, and Delarosa should have both been monitored and instructed as to signs and symptoms of impending stroke. *Hardy*, therefore, like *McKenna*, offers little support for Dr. Stokes's contentions.

Dr. Stokes also argues that Dr. Meyer's report failed to describe "how the breach of the standard of care caused injury, harm, or damages." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). According to the report, however, if Delarosa had been given the proper instructions about signs and symptoms of impending stroke, Delarosa would have known to "return to the hospital immediately" when these symptoms occurred and "the outcome would have been better more likely than not." Further, according to Dr. Meyer:

> Dr. Stokes' surgical treatment fell below the standard of care, so that the patient, as a result of his negligence in ignoring the vertebral artery clot, suffered thrombosis of one of the four main arteries supplying the brain, which caused permanent disability and inability to work or lead a normal life.

7

As to this statement, Dr. Stokes argues:

> Dr. Meyer's one sentence does not come close to addressing causation with the specificity required under the statute. He does not state what surgical treatment of Dr. Stokes caused the alleged damages or how Dr. Stokes was allegedly negligent in ignoring the clot.

To support his causation argument, Dr. Stokes relies on *Ehrlich v. Miles*, 144 S.W.3d 620 (Tex. App.—Fort Worth 2004, pet. denied), and on *Hardy*, 170 S.W.3d 865. In *Ehrlich*, because the expert was deemed not qualified to testify to much of what was originally contained in his report, the following was the only remaining statement of causation: "His [the doctor's] negligent activity that I listed above is the proximate cause of this patient's pain and suffering." Determining that this statement was insufficient to comply with the requirements of the predecessor to section 74.351, the court explained:

> The report fails to state whether each negligent activity listed above independently caused Appellant's pain and suffering or if each negligent activity combined to cause her pain and suffering. Because we hold that Dr. Marable is not qualified to testify to some of the negligent activity alleged in the report, the phrase "negligent activity that I listed above," without a specific indication that each alleged negligent activity was an independent cause, fails to link Dr. Marable's qualified statements of alleged negligent activities to the specific injuries in this case.

*Erhlich*, 144 S.W.3d at 628.

The circumstances giving rise to the court's conclusion in *Erhlich* are distinguishable. There, some of the testimony as to the doctor's negligent activity had been excluded, and a simple statement linking the "patient's pain and suffering" to the "negligent activity" was, therefore, insufficient. The *Erhlich* court had previously explained:

8

To comply with the expert report requirement, a plaintiff must only make a good faith attempt to provide a fair summary of the expert's opinions. It is the substance of the opinions, not the technical words used, that constitutes compliance with the statute. The expert report may be informal, and the information presented need not meet the same requirements as evidence offered in a summary judgment proceeding or in a trial.

*Id*. at 626-27 (internal citations omitted). Here, the substance of Dr. Meyer's report sets out his opinion that Dr. Stokes's "ignoring the vertebral artery clot" caused "thrombosis of one of the four main arteries supplying the brain, which caused permanent disability and inability to work or lead a normal life." Such statement is sufficient to satisfy the causation requirements set out in *Erhlich* and in section 74.351. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Erhlich*, 144 S.W.3d at 626-27.

In *Hardy*, the expert sought to establish causation with the following:

It is my opinion that this patient should have had a consultation with a vascular surgeon in view of his complaints before his discharge on 8-9-02. I recognize fully the importance of his other medical problems. It is my opinion then that if this patient had had more immediate treatment that a salvage of his right leg would have been more probable.

170 S.W.3d at 868. Determining that the statements were insufficient to establish causation, the court explained:

Nothing in this paragraph links Marsh's alleged inaction (immediate treatment as opposed to discharge) to Clyde's injury (the amputation). The report merely states that Clyde "should have had a consultation with a vascular surgeon." It does not state what additional procedures or treatment would have been provided by the surgeon. Nor does it connect the consultation to avoidance of the amputation. Nowhere in the expert report does Cassella set forth factors or explain the medical basis for his

9

opinion that "if this patient [Clyde] had had more immediate treatment that a salvage of his right leg would have been more probable."

*Id.* at 870. Here, however, as already noted, Dr. Meyer links Dr. Stokes's alleged inaction—failing to address and treat the vertebral artery clot—with Delarosa's injury—"thrombosis of one of the four main arteries supplying the brain, which caused permanent disability and inability to work or lead a normal life." Thus, Dr. Meyer's statements are distinguishable to those deemed insufficient in *Hardy*. *See id.*

Because Dr. Meyer's report sets out the standard of care—immediately addressing and treating the artery thrombosis—Dr. Meyer has sufficiently "inform[ed] [Dr. Stokes] of the specific conduct [Delarosa] has called into question." *See Palacios*, 46 S.W.3d at 875. And, Dr. Meyer's opinion that failure to immediately address and treat the vertebral clot caused "thrombosis of one of the four main arteries supplying [Delarosa's] brain, which caused permanent disability and inability to work or lead a normal life," Dr. Meyer's report "provide[s] a basis for the trial court to conclude that the claims have merit." *See id.* In these circumstances, we cannot conclude that the district court abused its discretion in finding that the report satisfied the requirements of section 74.351. *See* Tex. Civ. Prac & Rem. Code Ann. § 74.351(a), (r)(6); *Downer*, 701 S.W.2d at 241-42. Accordingly, we overrule Dr. Stokes's first issue.

In a second issue, Dr. Stokes argues that the district court should have granted his motion to dismiss because Dr. Meyer is not qualified to give opinions regarding the standard of care. We review a trial court's determination that an expert is qualified under an abuse-of-discretion standard. *Broders v. Heise*, 924 S.W.2d 148, 151-52 (Tex. 1996).

10

In a suit involving a health care liability claim against a physician, a witness is qualified to testify as an expert as to the physician's deviation from the applicable standard of care if he or she:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a) (West 2005). To assist the court in making a determination as to whether the expert is qualified on the basis of training or experience, the court shall consider whether the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id.* § 74.401(c). A trial court may "depart from [these] criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony," but, if the court does so, it must state the reason for the departure on the record. *Id.* § 74.401(d).

According to Dr. Meyer's curriculum vitae (CV), he currently holds the position of Emeritus Professor of Neurology at Baylor College of Medicine. He is board certified by the American Board of Psychiatry and Neurology. From 1957 to the present, he has been a professor

11

or adjunct professor of neurology at several universities, including Baylor College of Medicine, where he maintains his permanent office. He has also been involved in the practice of neurology in various hospitals since 1957, including several current consulting positions at Houston hospitals as well as an active staff position at The Methodist Hospital and Ben Taub General Hospital in Houston. Dr. Meyer's CV also includes several pages of honors and appointments in the field of neurology. In addition, Dr. Meyer has published 29 books in the field of neurology and over 900 articles related to neurology over the course of his career.

Despite these qualifications, Dr. Stokes argues that Dr. Meyer never states in his report that "he has knowledge of the accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in this claim" or that "he is qualified on the basis of his training or experience to offer expert opinions regarding Dr. Stokes' standard of care in this case." Dr. Stokes relies chiefly on *Broders v. Heise* in contending that Dr. Meyer, even though qualified in general matters of neurology, is unqualified to give opinions as to matters of neurosurgery and, in particular, as to the surgery at issue here. *See* 924 S.W.2d 148. He emphasizes the following passage from *Broders*:

> [G]iven the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization.

*Id.* at 152.

However, given the nature of Delarosa's claim and the proffered opinions, we conclude that the district court did not abuse its discretion in concluding that Dr. Meyer was

12

qualified to render those opinions. Dr. Meyer opined that the artery thrombosis should have been immediately treated and removed, that anti-platelet therapy should have been administered, and that Delarosa should have both been monitored and instructed as to signs and symptoms of impending stroke. A doctor who, like Dr. Meyer at the time of his testimony, holds an "active staff" position in neurology at The Methodist Hospital and Ben Taub General Hospital, is a professor of neurology at Baylor College of Medicine, is an adjunct professor of neurology for various other universities, is a consulting physician in the field of neurology for several hospitals, and is board certified in psychiatry and neurology, is qualified to opine that, in these circumstances, the artery thrombosis should have been immediately treated and removed, anti-platelet therapy should have been administered, and Delarosa should have both been monitored and instructed as to signs and symptoms of impending stroke. Accordingly, we overrule Dr. Stokes's second issue.

## CONCLUSION

Having overruled Dr. Stokes's issues, we affirm the order of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Henson

Affirmed

Filed: June 4, 2009

13